IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 27, 2004 Session

## STATE OF TENNESSEE v. JUDY C. TURNER

**Appeal from the Circuit Court for Sevier County**
**No. 8922     Richard R. Vance, Judge**

_____

**No. E2003-02440-CCA-R3-CD - December 7, 2004**

_____

Indicted for aggravated burglary and the attempted first-degree murder of her estranged husband, Judy C. Turner entered a best-interests plea to assault with intent to commit second-degree murder, a Class B felony. As part of a plea agreement with the state, the aggravated burglary charge was dismissed. The length and manner of service of the defendant's sentence was reserved for the trial court's determination. The trial court denied alternative sentencing and imposed a nine-year incarcerative sentence. On appeal, the defendant argues that she should have received an eight-year sentence making her eligible for probation or split confinement. For the following reasons, we affirm the judgment.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Rebecca D. Slone, Dandridge, Tennessee, for the Appellant, Judy C. Turner.

Paul G. Summers, Attorney General & Reporter; Michelle Chapman McIntire, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

This appeal stems from a protracted and rather complex sentencing hearing. The basic facts underlying the conviction offense are, however, virtually undisputed. During the evening of July 4, 2001, or the early morning hours of July 5, 2001, the defendant drove from her residence in South Carolina to her husband's home in Sevier County. The defendant's husband, Armond Turner, lived in the gated community of Shagbark, along with three of the couple's children.

The defendant parked her automobile at a nearby church, removed the car's South Carolina license plate, and put a note on the windshield, "Left to go with boyfriend. Be back soon."

The defendant ventured into the woods surrounding the gated community to locate the victim's residence and then surreptitiously gained entry into the house. The defendant proceeded upstairs to the victim's bedroom where he was asleep. The defendant hit the sleeping victim in the head twice with a claw hammer. The victim awoke in pain and struggled with the defendant. During the struggle, the defendant fell or was pushed down the stairs, allowing the victim to escape barefoot to a neighbor's house to summon help. Law enforcement officers later apprehended the defendant who was hiding nearby by a bale of hay.

The defendant's aberrant conduct and what precipitated her behavior were the focal points of the sentencing hearing commenced on July 28 and continued and concluded on September 9, 2003. The state called the victim as its first witness. Armond Turner testified that he had lived at 2821 Overholt Trail, in the Shagbark community, for eleven years. He spent fifteen years as a Staff Officer and United States Air Force fighter pilot before entering the private workforce in 1980 and starting his own business as a landlord. After being discharged from the military, the victim moved to Columbia, South Carolina, and he and the defendant were married in 1982. The couple had four children.

In 1993, the victim moved to Sevier County with the four children. The victim testified that the defendant had never lived at the Shagbark residence, although she had occasionally stayed at the home while visiting the children. The victim described the neighborhood as a gated community with 24-hour security. The victim was unsure but thought it entirely possible that the defendant had obtained a key to the residence.

The victim related that he had filed for divorce in June of 1997. Pursuant to a court order, the victim had temporary custody of the children, and the divorce was pending at the time of the defendant's assault. Also, the victim said that the defendant was aware the couple's two sons were away at Boy Scout camp. One of the couple's daughters, Serena, was preparing to enter college in a couple of weeks at the University of Tennessee, and the other daughter was married and living in Michigan.

According to the victim, he and the defendant "had arguments all the time," and he could not recall the last time he spoke with the defendant prior to the attack. He did not go to bed that evening until midnight or thereafter. The victim was uncertain if his outside doors were locked but said that he routinely did secure the doors. The victim related, "I went to sleep and the first thing I remember was just . . . I was in a totally black room and I felt pain and a giant flash of light that covered eighty or ninety percent of my view field and it just really hurt." Immediately afterwards, he felt the same pain, and when he opened his eyes, he saw the defendant. The victim said that he threw up his arms, got out of the bed, and struggled with the defendant. He recalled being at the top of the stairs, and below he saw Serena, who shouted to her mother, "What are you doing here?" He instructed his daughter to call 911; Serena hesitated, but when she moved to leave, the defendant said, "If you call 911 I will die." The victim's account of what next happened is somewhat muddled, but evidently he and the defendant began shoving each other, and the defendant tumbled down the stairs to the bottom landing.

The victim testified that after the fall, he shouted for his daughter to get into their Jeep and leave. In the meantime, the victim grabbed some clothing and ran out the back door, down the driveway, and down a freshly graveled road to a neighbor's house to summon help. When the police arrived, the victim explained what had happened; he was taken to the hospital and treated for the blows to his head and the injuries to his feet that occurred when he ran barefoot from the house. In terms of the healing process, the victim testified that he has residual problems with his left arm and continuing pain with his feet. Emotionally, the victim described the effect of the incident as "very destructive" for himself and the children. He said that he is constantly fearful of another attack. Moreover, because of the lengthy recovery period, the victim explained that the assault had been an economic "disaster" for him. The victim expressed his desire that the defendant be incarcerated for a lengthy time because he was fearful of another attack.

On cross-examination, the victim agreed that during the eleven or twelve years that he and the defendant were separated, they spoke little to each other except regarding the children and financial issues. Prior to the assault, the last time the defendant had been to the victim's residence was during the Christmas holidays in 2000. After that visit, the victim asked the defendant not to return, and he instructed the hired guards not to admit her into the neighborhood.

The victim admitted that during the marriage, he and the defendant had many disagreements, and at different times, each one had called 911 to report abuse. He denied, however, having been physically and verbally abusive toward the children, although after considerable prodding, he conceded that he curses badly when he is angry and that he "probably cursed" at the children. The defense inquired about his aggression toward the defendant, and the victim either denied the occurrences or dismissed them as events that had transpired more than eleven years earlier. Indeed, in his victim impact statement given to the presentence investigator, Mr. Turner maintained that he had been abused on a continuing basis while living with the defendant.

The defense inquired about possible motives for the defendant to abuse him. Although not entirely clear, the victim evidently believed that the defendant blamed him for losing custody of her child by a previous marriage and that the defendant might profit by inheriting insurance and property in the victim's name. The victim conceded, however, that he and the defendant had a prenuptial agreement that limited the defendant to retaining only her separate property.

Regarding his injuries from the assault, the victim agreed that the hospital staff detected no internal injuries. Likewise, he sustained no defensive injuries to his hands or arms. In fact, he was released to go home after his lacerations were stitched. At the time of the assault, the victim weighed over 200 pounds and stood five feet, nine inches tall. He had military defensive training and held a Judo brown belt. The victim did not know whether the claw hammer that the defendant used was one that he owned.

The defendant had been released on bond approximately three months prior to the sentencing hearing. The victim registered a number of complaints regarding her behavior, such as

calling the children on their cellular telephones, driving a vehicle that the victim had provided for his son's use, and having a "hostile attitude." As for the defendant being a physical threat, the victim said, "I don't think she could hurt me, if it was just her attacking me. But when she has a weapon[,] and I'm sleeping then I'm terrified." In his victim impact statement to the presentence officer, the victim also claimed that the assault had a detrimental impact on the children and that the children were afraid of their mother. The defense, however, pointed out that Serena testified at the preliminary hearing that she was "not the least" afraid of her mother, Serena had written letters and taken money to her jailed mother, Serena had visited her mother after her mother was released on bond, the oldest son was an excellent student and had been awarded a full college scholarship, and the oldest daughter had written letters and mailed gifts to the jailed defendant.

The oldest daughter, Carissa Karanth, who resided in Michigan traveled to Tennessee and testified at the sentencing hearing. She corroborated much of what her father claimed. She had witnessed many arguments between her parents over the years. According to Carissa, the defendant was the aggressor most of the time. Carissa recalled her mother throwing things such as clothes, spoons, and pots at her father and at Carissa herself. Carissa said that she had been struck by her mother; she denied ever being struck by her father other than parental paddling for discipline. Carissa admitted, however, that her father had yelled and screamed at the children and had cursed and said "ugly things" to them. She explained his conduct on the basis that "[h]e's a military man, he likes things organized and kids aren't always organized."

On cross-examination, Carissa confirmed that she had come to the jail to visit her mother and had sent her mother stamps and stationery. Carissa explained that she "felt sorry" for her mother. In terms of what she witnessed as a teenager, Carissa recalled both parents acting inappropriately. Once, her father forcibly pushed aside and knocked over chairs. Twice, her mother had thrown coffee on her father. Carissa denied that her father had threatened to disown her if she did not support him in litigation against her mother.

The defense proof at sentencing was extensive and began with the defendant's testimony. The defendant testified that she was 58 years old and was a retired registered nurse. She had practiced nursing for 36 years and was still registered in South Carolina and Tennessee. As a registered nurse, the defendant had worked numerous positions, from staff nurse to supervisory positions. Most of her work, the defendant explained, had been with trauma units in emergency rooms. Her last work was with the Veterans Administration Hospital in Columbia, South Carolina.

The defendant had been married to the victim for 21 years. They had been in divorce litigation since 1997 but had been separated since 1993 when the victim moved to Tennessee. After he moved to Tennessee, the victim dictated when the defendant could and could not visit with the children. The defendant testified that the impetus for the residence change was two-fold. The children were in private school in South Carolina, which became increasingly difficult to afford on the defendant's salary. Also, the oldest daughter became sexually active, resulting in statutory rape charges being brought against her boyfriend. The defendant agreed, reluctantly, for the victim to

temporarily relocate with the children to Tennessee. The defendant did not move with the family because she had steady employment and retirement benefits.

The defendant elaborated about her early years of marriage to the victim and about their financial struggles leading to the defendant's return to the workforce, even though they had young children at the time. The defendant denied that she had ever abused the victim, but she related a pattern of domestic violence that escalated over time. According to the defendant, they argued almost on a daily basis, even after they separated. Contrary to the victim's testimony, the defendant said that he frequently threw things at her and the children. The defendant identified one photograph of their South Carolina residence, showing the kitchen strewn with garbage, and she testified that the victim had become angry and dumped a trash can in the floor.

The defendant testified at length and in great detail about the family dynamics in the household. We need not recount all the particulars. Suffice it to say that the defendant described the victim as controlling, verbally abusive toward the children and herself, sometimes physically abusive, and unreasonably demanding concerning "chores" that he expected the children to perform. The defendant identified and introduced an audio tape that her daughter Serena had recorded many years earlier wherein the victim was cursing and referring to Serena in highly disparaging terms. The defendant also identified a handwritten note by Serena quoting her father as calling the children "assholes," "bitches," and "bastards" and telling them that they "weren't worth raising." The defendant had also saved a diary that one of her sons had kept; she read excerpts from daily entries in 1997 reporting that the victim had come at one of the daughters "like a boxing man and hit her," that the victim was not "popping [the children] as much the last month," and that the victim threw an air conditioner part and gas can at the diary's author.

According to the defendant, the victim's behavior interfered with her employment obligations. She testified that the victim would telephone her at work several times a day, and because he would be screaming in a loud voice, everyone in the nurse's station could hear him. The defendant said that "it was very embarrassing." The defendant also testified that once the victim called the defendant's supervising nurse and tried to get the defendant fired.

The defendant was asked how the victim's behavior had affected her emotionally. The defendant explained that shortly before the assault, she had sought treatment for depression. An emergency room physician wrote the defendant a prescription for Paxil. Before taking Paxil, the defendant had consistently received excellent proficiency reports; afterwards, she was reprimanded by her supervisor, Amy Joseph. The defendant's recall of that incident was hazy, as was her memory of the assault on the victim. The defendant testified that she could not recall driving to Tennessee and that, under the best of circumstances, she would have found it physically challenging to traverse the rough terrain around the victim's neighborhood. Only after being arrested did the defendant realize that her body was badly bruised and that she had a big knot on her head. The defendant spent ten months in pretrial detention in the Sevier County Jail, during which time she did not take Paxil. Also, during that time, the defendant had no disciplinary problems.

With the financial assistance of friends, the defendant ultimately was able to post bond. The defendant said that since her release, she had been living with various friends because the victim had locked her out of the residence in South Carolina. The defendant was under the care of a psychologist and a psychiatrist, taking Nortriptylene for depression, and had retired from nursing. To be closer to her children, the defendant had relocated to Tennessee.

Defense counsel attempted to draw upon the defendant's medical expertise to testify about negative reactions to and side effects associated with Paxil. The defendant explained that she had sought out one of the leading experts in the country, Dr. Peter Breggin, to testify about the side effects of frequently prescribed antidepressants, such as Paxil and Prozac. However, Dr. Breggin's expert fees -- beginning at $50,000 -- were prohibitively expensive to retain his services. As an alternative, the defendant, with the court's permission, introduced and summarized findings published by Dr. Breggin, who has also testified in numerous criminal cases about the effects of antidepressants. In essence, the antidepressant, Paxil, is a serotonin blocker that, according to Dr. Breggin, can trigger a drug-induced mania leading to suicide and other aggressive, violent acts. For individuals already suffering from depression, such an antidepressant can cause severe anxiety and agitation.

On cross-examination, the state explored the defendant's claimed inability to recall assaulting the victim or even being arrested. The defendant said that her last certain memory was the victim coming to South Carolina the week prior to July 4 and her daughter Serena begging not to return to Tennessee. The defendant agreed that she was familiar with the interior layout of the victim's house, inasmuch as she had "cleaned the house repeatedly." She, likewise, agreed knowing that the boys were away that week at camp, because she "had paid for the camp."

The defense read into the record excerpts from the preliminary hearing testimony of Officer Robertson who was dispatched to the victim's neighborhood and apprehended the defendant. Officer Robertson testified that he found the defendant hiding in a briar thicket, wet and covered with mud. The defendant told him that she was looking for her son. Other things the defendant was talking about "didn't make sense" to the officer. Another officer who later arrived at the scene, Officer Holt, testified at the preliminary hearing that the defendant was "pale, damp, wet, and told [him] she was looking for her son." When asked to describe the defendant's demeanor, Officer Holt said that she was "incoherent and out of breath."

The defendant's former nursing supervisor, Amelia Joseph, testified that the defendant had been a good employee who worked primarily on the weekends as the charge nurse. Ms. Joseph said that the defendant "reacted well to emergency situations" and took good care of the patients. Ms. Joseph recalled that shortly prior to July 4, 2001, she noticed a change in the defendant's behavior, such as "not attending to the task at hand, sort of flitting from thing to thing without completing it." Ms. Joseph reprimanded the defendant, and they discussed the defendant's problem on two occasions. Ms. Joseph said that the defendant confided that she had started taking Paxil. Ms. Joseph recounted a couple of incidents, illustrating the defendant's "bizarre" behavior, which peaked on July 2 to the point that Ms. Joseph had decided that after Independence Day she

would have to give the defendant written notice to "shape up" because patient care was being compromised. The defendant's intervening arrest changed those plans.

Ms. Joseph testified that she spoke by telephone with the defendant immediately after her arrest. Ms. Joseph, however, explained that she did not realize from where the defendant was placing the call. The defendant asked for emergency leave for Friday but seemed confident that she would be back to work on Saturday. By Sunday, Ms. Joseph realized that the defendant was incarcerated. The defendant called on Sunday and was "sobbing hysterically" and not "making any sense." The only thing that Ms. Joseph clearly understood the defendant to say was that she had been told that she hit the victim with a hammer but that the defendant did not remember anything. Ms. Joseph said that the defendant called her a second time on Sunday, concerned about overdue library books and wanting Ms. Joseph to return the books. Ms. Joseph returned the books, and she admitted on cross-examination that she had never been to the defendant's home prior to retrieving the books.

Another co-worker, Deborah Hogue, testified that she and the defendant worked together several years as staff nurses at the Veterans' Administration medical center in Columbia, South Carolina. Ms. Hogue knew the defendant to be an excellent nurse and focused on her job. Ms. Hogue was present on occasions when the victim would call the defendant at work. Ms. Hogue said the victim called practically every shift that the defendant worked, and Ms. Hogue could hear him screaming in an angry voice and using obscenities over the telephone. Ms. Hogue never heard the defendant scream back at the victim. The defendant declined Ms. Hogue's offers to block the victim's calls because the defendant said "it would just make it worse at home." Ms. Hogue testified that she had met the victim on several occasions, but had never been to the South Carolina residence.

Ms. Hogue said that she observed bruises on the defendant's arms on three or four occasions in the late 1980s and early 1990s. On one such occasion, Ms. Hogue saw what appeared to be bruises in the shape of fingerprints. When, however, Ms. Hogue confronted the defendant, the defendant denied any domestic abuse problems.

Ms. Hogue identified a letter that her son had written regarding a brief period of time when her son worked for the victim. Her son quit working for the victim because her son became uncomfortable with the victim's angry and controlling behavior directed at the victim's children. One child, in fact, had blackened eyes that the victim explained as resulting from a fall.

For its next witness, the defense called Gwen Ford, who lived in the Shagbark community and knew the victim, the defendant, and the children "very well." Her opinion of the victim was very negative. The victim had complained to Ms. Ford that the defendant had ruined his life, that he could not stand the defendant, and that he would like to "get rid of" the defendant. Ms. Ford found the victim to be very intimidating, and she was frightened about possible retaliation concerning her testimony. Ms. Ford explained that the victim had already threatened to ruin her reputation if she testified. Ms. Ford had been present on many occasions when the victim cursed and belittled the children; she never observed any similar behavior from the defendant. Ms. Ford also had heard the victim threaten the children to be supportive of his position.

Another witness, Georgine Clower, whose children attended school in South Carolina with the Turner children, testified that she had a good relationship at one time with the oldest child, Carissa. Ms. Clower related an incident in the early 1990s in the school parking lot. She saw the victim drive up with his children. Carissa got out of the car and accidently slammed the car door on Serena's finger. After Serena was taken care of, Ms. Clower witnessed the victim berate Carissa in a loud, "very alarming," and "very intimidating" fashion. Ms. Clower was particularly struck by what she described as Carissa's deer-in-the-headlights reaction. Ms. Clower approached Carissa, who was trembling, and Ms. Clower put her arm around the child and offered to walk her to the classroom. The victim became upset and told Ms. Clower to "[s]tay out of this." Ms. Clower took Carissa to her classroom, and then Ms. Clower reported what had happened to the school counselor.

From time to time, Ms. Clower visited the Turner residence, and she observed firsthand the victim's "dictatorial" demeanor, which included berating the defendant because the defendant had not cleaned the fireplace andirons. Ms. Clower explained on cross-examination that she lost contact with the Turners after the victim moved with the children to Tennessee in 1993.

Gary and Michelle Williams lived across the street from the Turners' home in South Carolina. He testified that many times, when he was out working in his yard, he would hear loud, disruptive things going on at the victim's residence. Specifically, Mr. Williams said that the victim would be addressing his children, using foul and offensive language. The victim's behavior was such that Mr. Williams would send his own children inside the house to avoid hearing the victim's tirades. Additionally, Mr. Williams often heard the victim address the defendant in a similar fashion. Ms. Williams testified about a particular occasion when she overheard the victim cursing and telling his sons that he hated them.

Becky Johnson, an elderly resident of Columbia, South Carolina, testified that she originally met the victim through membership in MENSA. Before she retired, Ms. Johnson was a medical technologist and later a social worker. Through her social work, Ms. Johnson had extensive experience dealing with abused children, and in her opinion the victim had exhibited certain behavior that caused her concern. Ms. Johnson related an occasion when, at the victim's request, she accompanied him and his children to Tennessee to help decorate the residence. During that time, Ms. Johnson witnessed the victim's behavior toward the children, which she regarded as highly inappropriate, such as criticizing and belittling the children if they did not behave exactly as he wished and disparaging the children's mother in their presence. Ms. Johnson testified that the children acted afraid of the victim. Ms. Johnson said she was surprised when she finally met the defendant because the defendant did not match the profile related by the victim.

Diane Levy was qualified by the defense and accepted by the court as an expert in the field of domestic violence. Ms. Levy was serving on the state coordinating council on domestic violence, and she had been working approximately 20 years with an organization, Safe Space, of which she was a founder. She also was one of the founders of the Southeast Coalition Against Domestic Violence. Ms. Levy began working with battered women in 1969 in England. Since 1976,

she had been working with domestic violence victims in Tennessee, and she had previously testified and been accepted as an expert in that area.

In preparation for testifying, Ms. Levy had reviewed, *inter alia,* letters, statements, reports, the husband's victim impact statement, and similar materials provided by defense counsel. Ms. Levy had briefly interviewed the defendant, and she had talked with numerous witnesses who had testified on the defendant's behalf. Ms. Levy began by giving an overview of the cycle of domestic abuse and violence, and she proceeded to explain the effects of domestic violence on the victims. We need not recount her testimony point by point. It is sufficient to note that in her expert opinion, life in the Turner household for a considerable number of years had been punctuated and defined by Mr. Turner's domestic abuse. Ms. Levy testified that without doubt the defendant met the criteria of being a victim of domestic violence.

On cross-examination, the state elicited that Ms. Levy had not spoken with any of the Turner children or with the victim and that the materials Ms. Levy reviewed had been provided by only one source, defense counsel, and were incomplete.

In addition to live witness testimony, the defense submitted extensive written materials to the court, *inter alia*, from people who supported the defendant and/or who knew of the victim's pattern of abusive behavior toward other family members. In particular, the defense relied upon the report of psychologist Peter Young, who had evaluated the defendant. He concluded that at the time of the offense, the defendant was probably impaired cognitively and psychologically but that based on subsequent treatment, she did not pose a present risk of harm to herself or others, in particular the victim.

At the close of the sentencing proof, the state argued that two enhancement factors applied: that the defendant possessed or employed a deadly weapon during the commission of the offense, Tenn. Code Ann. § 40-35-114(10) (2003), and the defendant abused a position of private trust, *id.* § 40-35-114(6) (2003). The defendant, as a Range I Standard Offender, was subject to a sentencing range of eight to twelve years for her Class B conviction offense, *see id.* § 40-35-112(a)(2) (2003), and the state asked for a maximum, twelve-year sentence.

For its part, the defense contested application of the private-trust enhancement factor and argued that the court should give little weight to the deadly-weapon enhancement factor. The defense advocated consideration of numerous and weighty mitigating factors, such as the effect that Paxil had on the defendant, the defendant's preexisting depression, the absence of any prior criminal history or behavior, her excellent work history, the domestic violence inflicted by the victim on the defendant and their children, and the improbability of the defendant being a threat to society or the victim. The defense asked the court to impose an eight-year suspended sentence, giving credit for the ten months spent in pretrial incarceration and utilizing supervised probation.

After a recess, the court announced and explained the sentence to be imposed. The court began by acknowledging the thorough preparation and presentation by counsel for the parties,

and it referenced the extensive testimony, exhibits, presentence investigation report, and other materials that it had reviewed and considered. The court referenced the statutory sentencing procedures that guide its decision making and then made the following initial observations:

> The story of [the Turners'] marriage is not a pleasant one at all. A very stormy marriage. Statements and accounts of particular incidents which are alleged to have occurred over the years are contradictory. . . .
>
> Each says the other was physically abusive[,] . . . [b]ut it must be made clear that that evidence of the history between the parties and their marriage, and issues regarding the children, those are issues with respect to child custody and divorce. . . . [T]hat evidence has been received solely for determination of the existence of any mitigating factors that may apply in sentencing.

Addressing first the enhancement factors, the court concluded that the hammer qualified as a deadly weapon and was employed in the commission of the offense. The court placed great weight on that factor, stating that it alone would justify a maximum sentence of twelve years. The court did not, however, find that the defendant abused a position of private trust, inasmuch as the parties were separated; alternatively, the court said that even if the factor applied, it would have no weight.

In terms of mitigating sentencing factors, the court found that the defendant had "borne good character," she had an excellent work record, she had no prior criminal record, and the defendant had obtained psychological help and was taking medication under a doctor's supervision. The court further concluded that the defendant, at the time of the offense, suffered from depression, although that mental condition did not constitute a legal defense or negate criminal responsibility.

Regarding the use of Paxil for depression, the court was not impressed by what it perceived to be the defendant's self-medicating approach of asking a co-worker to prescribe the antidepressant without adequate monitoring for any side effects. Because of the elaborate planning in connection with the offense, the court also rejected the argument that the defendant's behavior resulted from a side effect of taking Paxil. Finally, in terms of reduced culpability, the court noted that the original offense of attempted first-degree murder had been reduced to attempted second-degree murder.

The court rejected the defense argument that it should consider as mitigation that the defendant acted under strong provocation. The court pointed out that for quite some time, the parties had been separated and were living in different states. Also, at the time of the assault, the defendant was in no imminent danger.

The court concluded that the mitigating factors, which did exist, justified a sentence reduction. "Considering all these factors," the court said, "weighing them together, the Court finds that the mitigating factors that I have found do justify and warrant a reduction of the sentence from the maximum, from 12 years to 9 years, a significant 3-year reduction." The court then acknowledged that the sentence made the defendant statutorily ineligible for probation, but in any event probation would not be appropriate because the defendant had expressed no remorse for her actions and because confinement was necessary to avoid deprecating the seriousness of the offense.

Aggrieved by her incarcerative nine-year sentence, the defendant has appealed. As we understand her argument, the defendant complains that the trial court erred by not considering the effect that Paxil had on her cognitive abilities, the trial court assigned excessive weight to the use-of-a-deadly-weapon enhancement factor, the trial court gave too little weight to the mitigating factors, the trial court's recognition that the grade of the offense had been reduced amounted to an improper application of a non-statutory enhancement factor, and the trial court improperly relied on deterrence when noting that confinement was necessary to avoid depreciating the seriousness of the offense. The defendant insists that the trial court should have imposed an eight-year suspended sentence or ordered split confinement of twelve months served in the county jail with the balance of the sentence on supervised probation.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In the event the record fails to demonstrate the required consideration by the trial court, the presumption is removed, and review of the sentence is purely *de novo. Id.*

Our sentencing review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210(a), (b) (2003); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993); *State v. Smith*, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). Additionally, the reviewing court "is required to give great weight to the trial court's determination of controverted facts as the trial court's determination is based upon the witnesses' demeanor, appearance, and inflection in their voices." *State v. Jernigan*, 929 S.W.2d 391, 395 (Tenn. Crim. App. 1996). The burden is on the defendant to demonstrate that the imposed sentence is improper. *Ashby*, 823 S.W.2d at 169; *Jernigan*, 929 S.W.2d at 395.

We begin our analysis by observing, as did the trial court, the thoughtful and thorough preparation and presentation by counsel for the parties. Similarly, the trial court's comprehensive

findings and conclusions have greatly facilitated our review, and its determinations are entitled to the presumption of correctness.

As a matter of law, the defendant in this case was not presumed to be a favorable candidate for alternative sentencing options. Only a defendant who "is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (2003). The defendant before us stands convicted of a Class B felony and is, thereby, ineligible for the presumption. As a result, the state had no burden to justify an incarcerative sentence. *State v. Michael W. Dinkins*, No. E2001-01711-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Knoxville, Apr. 26, 2002); *see* Tenn. Code Ann. § 40-35-103(1) (2003); *State v. Zeolia*, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996) (when presumption of favorable candidacy for alternative sentencing options applies, state must justify confinement by showing "evidence to the contrary" of the presumption).

Nevertheless, the defendant in this case was potentially eligible for a probated sentence. That is, the sentencing range for her Class B felony was eight to twelve years, *see* Tenn. Code Ann. § 40-35-112(a)(2) (2003), and a "defendant shall be eligible for probation . . . if the sentence actually imposed upon such defendant is eight (8) years or less," *id*. § 40-35-303(a) (2003). The trial court, however, imposed a nine-year sentence and, consequently, eliminated probation as a sentencing option. For that reason, the defendant attacks the trial court's length-of-sentence determination.

The argument that the trial court assigned excessive weight to the use-of-a-deadly-weapon enhancement factor and gave too little weight to the mitigating factors fails. It fails because a defendant's "sentence is not determined by the mathematical process of adding the sum total of enhancing factors present then subtracting from this figure the mitigating factors present for a net number of years." *State v. Boggs*, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). The law is settled that "the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." *Id*. at 475-76. Simply stated, the defendant in this case has shown no basis to disturb the trial court's weight assignment to the existing enhancing and mitigating factors.

The defendant's secondary length-of-sentence argument is that the trial court failed to apply a mitigating factor and improperly considered a non-statutory enhancing factor. In our opinion, the trial court's rejection of the defendant's use of Paxil as a mitigating factor was reasonable. The defendant was unable to demonstrate a concrete connection between *her* use of Paxil and subsequent adverse side effects causing a psychological and cognitive breakdown that, in turn, acted as a catalyst for her assault. To be sure, the defendant explained that she could not afford to retain the expert of her choice to testify about the adverse side effects from the use of antidepressants. Even so, assuming arguendo that antidepressants may have negative effects on certain members of the population, it does not automatically follow that the defendant fell into that group. Taken in the

best light, the defense proof was that shortly prior to the attack, the defendant's co-workers noticed a change in her behavior and that the defendant professed to remember nothing about the event, including driving from South Carolina to Tennessee. This evidence hardly catapults antidepressants into a unique sentence-mitigation role.

As for the defendant's claim that her plea to a reduced charged was misused by the trial court as a non-statutory enhancing factor, we must disagree. First, it is clear from the trial court's remarks that it did not consider the defendant's plea to be a basis to enhance her sentence. Rather, the court mentioned the plea in connection with the defendant's insistence that the court should consider as a mitigating factor her reduced culpability attributable to her depression and/or provocation by the victim. We see nothing sinister in the court's observation that the type of *mitigation* advocated by the defendant had already been factored into her sentencing via the agreement that she could plead to a lesser charge. *See State v. Garland Godsey*, No. E2000-01944-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Dec. 4, 2001) (no "hard and fast rule" about giving "double credit" for mitigating factor when conviction of lesser-included offense indicates consideration already given to same mitigating sentencing factor; a matter of discretion), *perm. app. denied* (Tenn. 2002).

In summary, pursuant to Tennessee's conventional sentencing procedures, there are no grounds to disturb the trial court's length-of-sentence determination. That said, we must be mindful, however, of the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004), in which the Court pronounced that a judicially imposed sentence, other than when based on the fact of a prior conviction, cannot exceed the maximum sentence statutorily allowed "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant" unless the facts relied upon for enhancement are found to exist beyond a reasonable doubt by a jury. *Id*. at ___, 124 S. Ct. at 2537 (emphasis omitted). Moreover, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." *Id*., 124 S. Ct. at 2537. Thus, *Blakely* clearly applies to individual length-of-sentence determinations in Tennessee.

*Blakely*'s impact on sentencing in this case is problematic. The issue is aptly framed in Judge Woodall's concurring (in part) opinion in *State v. James Johnson*, No. W2003-02009-CCA-R3-CD (Tenn. Crim. App., Jackson, Oct. 20, 2004):

> [U]nder *Blakely*, it is clear that only evidence of prior convictions can be used to enhance a sentence without a jury making a determination of the existence of an enhancement factor, or where the jury determination is waived by the defendant, or where the application of another enhancement factor is "admitted" by the defendant. The term "admitted by Defendant," while seemingly clear at first glance, has not been conclusively defined by judicial decision. The United States Supreme Court in *Blakely* may have meant "admitted" in the context of a judicial proceeding such as a guilty plea hearing with the

> solemnity of a guilty plea. Or, the Court possibly meant an admission
> by a defendant in testimony at a sentencing hearing. Thus, the
> meaning of the term "admitted by the defendant" is subject to debate,
> and is better left to appellate review when that precise issue has been
> squarely addressed by a trial court and thereafter raised on appeal.

*Id.*, slip op. at 1 (Woodall, J., concurring in part and dissenting in part).

The record before us reflects that the defendant entered a "best interests" plea. Pursuant to a "best interests" plea, an individual may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his crime or protests his innocence. *See State v. Allen*, 10 S.W.3d 286, 291 (Tenn. Crim. App. 1999); *Dortch v. State*, 705 S.W.2d 687, 688 (Tenn. Crim. App. 1985). Consequently, it is by no means evident that the defendant's plea constituted an "admission" in the *Blakely* sense regarding application of enhancement factor (10) that a deadly weapon was employed during the commission of the offense. *See State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3-CD (Tenn. Crim. App., Nashville, Oct. 4, 2004). Turning next to the sentencing hearing testimony, the defendant testified that she recalled nothing about the incident, including driving from South Carolina to Tennessee; that testimony hardly appears to qualify as a *Blakely* admission.

As we view the matter, the only possibly viable admissions relate to defense counsel's argument at the conclusion of the sentencing hearing. At that time, counsel stated,

> Regarding the enhancement factor of the use of a deadly
> weapon, I'm not going to argue the fact that a hammer is not a deadly
> weapon. It most certainly has been found to be by the courts.
> However, you once again have to look at the circumstances of that
> hammer with this particular Defendant. . . .
>
> . . . So it would be our position that, although she did use a
> deadly weapon, Your Honor, that in these particular circumstances that
> that is not an enhancement factor that the court should weigh heavily
> in regard to this case.

Additionally, defense counsel does not challenge on appeal the applicability of the deadly-weapon enhancement factor but, rather, the "excessive" weight that the trial judge assigned to the factor.

In our opinion, the position advocated by defense counsel in this case operates as an admission for purposes of *Blakely*. It strikes us as particularly critical, pursuant to *Blakely*, that counsel's concession conclusively resolved an issue, thereby eliminating any credibility or other factual disputes related to the use of the deadly weapon. *See State v. Steven M. Stinson*, No. E2003-01720-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Knoxville, Jul. 29, 2004) (noting that defendant

-14-

conceded on appeal that enhancement factor (16) applied and did not contest the trial court's application of that factor).

In conclusion, we discern no statutory or constitutional basis to disturb the sentence imposed by the trial court; we, therefore, affirm the trial court's judgment.

_____
JAMES CURWOOD WITT, JR., JUDGE